UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE G. AMEZQUITA,

Plaintiff,

v.

GARCIA-CORTEZ, et al.,

Defendants.

Case No. 20-cv-08285 BLF (PR)

**ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO SETTLEMENT PROCEEDINGS; STAYING CASE; INSTRUCTIONS TO CLERK**

(Docket No. 32)

Plaintiff, a state inmate, filed the instant *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against prison staff at Salinas Valley State Prison ("SVSP").  Dkt. No. 1.  The first amended complaint ("FAC") is the operative complaint in this action.  Dkt. No. 12.  The Court found the FAC stated cognizable claims for excessive force and retaliation, took supplemental jurisdiction over the related state law claims, and ordered the matter to be served on Defendants.  Dkt. No. 20.

Defendants Garcia and Meredith filed a motion for summary judgment, supported by declarations and exhibits, asserting that there is no genuine issue as to any material fact, that they are entitled to judgment as a matter of law, and that they are also entitled to

1   qualified immunity.  Dkt. No. 32.[1]  Plaintiff did not file opposition although given an

2   opportunity and extension of time to do so.  Dkt. No. 34.  However, the FAC is verified

3   and therefore may be treated as an opposing affidavit.[2]

4          For the reasons discussed below, Defendants' summary judgment motion is

5   **DENIED IN PART and GRANTED IN PART**.

6

7                                    **DISCUSSION**

8   **I.     Statement of Facts**[3]

9          This action involves an allegation of excessive force against Defendant Garcia.

10  Defendants request that the Court take judicial notice under Federal Rule of Evidence

11  201(b)(2), of Section 51020.5 of the California Department of Corrections and

12  Rehabilitation's Department Operations Manual (DOM), entitled "Use of Force Options,"

13  which provides:

14          [w]henever possible, verbal persuasion should be attempted in an effort to
15          mitigate the need for force.  The type of verbal persuasion will vary
            dependent upon the inmate's ability to understand.  If time permits, verbal
16          orders should be issued prior to resorting to force and are required to be
            provided before controlled force is used.
17

18

19  [1] In support of the motion, Defendants submit declarations from the following: (1) counsel
    Michael J. Quinn, Deputy Attorney General, Dkt. No. 32-1, along with exhibits, including
20  excerpts from the transcript of Plaintiff's deposition (Ex. A), (2) Defendant Meredith, Dkt.
    No. 32-3, along with an exhibit, and (3) Defendant Garcia, along with an exhibit, Dkt. No.
21  32-6.

22  [2] A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is
    based on personal knowledge and sets forth specific facts admissible in evidence.  *See*
23  *Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's
    verified complaint as opposing affidavit where, even though verification not in conformity
24  with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and
    correct, and allegations were not based purely on his belief but on his personal
25  knowledge); *see also Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996), amended,
    135 F.3d 1318 (9th Cir. 1998) (treating allegations in prisoner's verified amended
26  complaint as opposing affidavit).

27  [3] Because no opposition has been filed, the Court accepts Defendants' statement of facts,
    unless indicated that facts are in dispute with Plaintiff's verified FAC and other evidence.

28                                         2

United States District Court
Northern District of California

Req. for Jud. Not., Ex. A; Dkt. No. 32-5.

Rule 201(b)(2) provides that the court may take judicial notice of a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Under the CDCR's DOM, one of the options available to staff are "less-lethal weapons," which are "any weapon that is not likely to cause death" and that a "37mm or 40mm launcher and any other weapon used to fire less-lethal projectiles is a less lethal weapon." Dkt. No. 32, citing Ex. A. A 40mm launcher fires 6325 impact rounds, non-lethal rubber rounds that officers are authorized to shoot below the waist. *Id.* The Court grants Defendants' request and will take judicial notice of the fact that the CDCR has a policy regarding the appropriate use of force, which may include the use of less-lethal weapons like a 40mm launcher used to fire less-lethal projectiles, as in this action.

### A.   Incident on January 23, 2020

According to Plaintiff, for many months following his arrival at SVSP on November 3, 2018, he was "threatened, ridiculed, intimidated, and otherwise harassed" by several officers, including Defendant Garcia, for making allegations against the "Green Wall" of which Plaintiff believed Defendant was a member. Dkt. No. 12 at 3. Defendant Garcia's declaration is silent regarding this allegation. *See generally* Dkt. No. 32-6.

On the morning of January 23, 2020, Defendant Garcia was serving as the Facility A5 Control Booth Officer at SVSP. Garcia Decl. ¶ 3; Dkt. No. 32-6.[4] At one point, he observed six inmates striking each other in the facial and upper torso areas with their fists. *Id.* Defendant Garcia gave them verbal orders to get down, but the inmates did not comply and continued fighting. *Id.* at ¶ 4. To prevent further injuries and to gain compliance with a lawful order, Defendant Garcia aimed his 40mm launcher at the left thigh of one of the fighting inmates. *Id.* He fired one direct foam baton round from approximately 50 feet

---

[4] Defendant Garcia also provides a copy of the incident report he prepared the same day following the incident. Garcia Decl., Ex. A; Dkt. No. 32-6 at 5.

from his elevated position. *Id.* Due to lag time and the rapid movement of the fighting inmates, the 40mm round struck the center of the intended inmate's back. *Id.*

Defendant Garcia continued to assess the incident as he reloaded a second direct foam baton round into the launcher. *Id.* at ¶ 5. He again gave the fighting inmates direct orders to get down with negative results. *Id.* To prevent the fighting inmates from injuring each other, he aimed the 40mm launcher at another inmate's right thigh while ordering the combative inmates to get down. *Id.* Because the inmates continued to ignore his verbal orders, Defendant Garcia fired a direct impact foam baton round from approximately 52 feet but missed his intended target. *Id.* According to Defendant, due to this inmate's movements, the round skipped on the ground and struck Plaintiff. *Id.*

Because the inmates continued fighting, Defendant Garcia immediately reloaded a third direct foam baton round and again gave the fighting inmates direct orders to get down. *Id.* at ¶ 6. When the inmates again ignored his order, Defendant Garcia aimed the 40mm launcher at the left thigh of another fighting inmate and fired a third direct impact foam baton round from approximately 53 feet, which struck his intended target. *Id.* Nevertheless, the inmates continued fighting, so Defendant Garcia reloaded a fourth direct foam baton round. *Id.* at ¶ 7. Before firing the launcher for a fourth time, he again ordered the inmates to stop fighting and prone out. *Id.* Because the inmates failed to comply with his orders and continued fighting, Defendant Garcia aimed the 40mm launcher at the left thigh of another fighting inmate. *Id.* That round failed to strike its target, and instead struck a concrete table. *Id.* At that point, the six inmates stopped fighting and Defendant Garcia observed several correctional officers placing handcuffs on them. *Id.* at ¶ 8. Defendant Garcia continued to provide gun coverage while responding staff placed the inmates in handcuffs and escorted them to the Facility A Gymnasium holding cell for medical evaluation. *Id.* According to the notes from the medical examination, Plaintiff reported that he "was walking and just got me." Quinn Decl., Ex. C; Dkt. No. 32-1.

According to Plaintiff's allegations in the FAC, the fight broke out approximately

United States District Court
Northern District of California

50 feet away from him.  Dkt. No. 12 at ¶ 5.  But at an interview with Defendant Meredith that took place within a month of the incident, Plaintiff described that distance as fourteen to sixteen feet.  *See infra* at 5, lines 15-16.  The FAC alleges that "[a]s soon as the fight broke out, and without any warning to get down, [Plaintiff] was maliciously and sadistically shot indiscriminately" by Defendant Garcia with a 40mm block gun, resulting in a deep bone bruise to his sternum.  Dkt. No. 12 at ¶ 6.  Plaintiff stated that "[n]obody in close proximity to A5 building" was in any imminent danger of serious injury to warrant the firing of the block gun.  *Id.* at ¶ 9.  He also described Defendant Garcia as firing the gun "in a wild and unarticulated fashion which was completely unnecessary in any effort to protect inmate or staff safety."  *Id.*  Plaintiff stated that the fight was not deemed a serious event or a major disruption in the security of the prison, and such a "minimum incident" that the participants were not charged with any serious rule violations.  *Id.* at ¶ 7.

During his deposition, Defendants' counsel asked Plaintiff whether Defendant Garcia was aiming at the fighting inmates the entire time.  Pl. Dep. at 67:1-2, Dkt. No. 32-1 at 7.  Plaintiff responded: "he drop me, I look – no, no, no.  I look to the tower.  The windows open – open – clear open, and he shooting, shooting, shooting, shooting.  He never stop and say get down.  Never."  *Id.* at 67:3-6.  When asked again whether Defendant was aiming at the inmates, Plaintiff replied, "Yes.  Yes, he shot all of them."  *Id.* at 67:10-11.  When asked to confirm that Defendant was "aiming at you, correct?", Plaintiff responded: "That's – my problem is – is aiming the people fighting.  I not fighting.  Why he shoot me?  That's my question.  Why he shot me?  I'm not fighting."  *Id.* at 67:15-18.  Plaintiff also stated that Defendant hit him with the first round: "He hit me the first round.  The first one, he shot me.  I'm not fighting."  *Id.* at 67:23-24.  When pressed again whether Defendant was aiming at the fighting inmates, Plaintiff stated, "I don't – I don't recall.  I'll be honest with you.  I don't remember."  *Id.* at 69:11-15, Dkt. No. 32-1 at 8.  Plaintiff insisted that he needed to see his paperwork, and that "It's true what I put there."  As counsel continued to press him, Plaintiff answered, "I know he

5

aiming at me.  I don't know why or what, but I know he shot me trying to shoot my face down.  I don't know.  I don't know." *Id.* at 74:3-6, Dkt. No. 32-1 at 9.  Plaintiff insisted, "He aiming to me.  He aiming to me.  He not trying to hit nobody else.  He aiming to me.  He trying to take my face off.  I don't know why.  I never done nothing to him, and that's my answer….  Sorry.  I'm sorry… that's – I saw his face.  Every single time I see his face, I get scared.  I be honest." *Id.* at 74:19-25, Dkt. No. 32-1 at 9.

In the FAC, Plaintiff alleged that following the incident, Defendant Garcia told another inmate who was shot that he had been "waiting to get plaintiff and plaintiff 'got what he had coming.'"  Dkt. No. 12 at 5, ¶ 11.  Plaintiff also alleged that Defendant Garcia told him that he could complain about it, he "didn't care what [Plaintiff] did," and that he "got what [he] had coming." *Id.* at ¶ 12.  Plaintiff also stated that after he came back from medical triage, Defendant Garcia told him that next time he would use a "real gun." *Id.* at ¶ 13.  Defendant Garcia does not address these allegations against him in his declaration. *See generally* Dkt. No. 32-6.

### B.    Grievance and Interview

On February 21, 2020, Plaintiff filed an inmate grievance alleging staff misconduct by Defendant Garcia for shooting him unnecessarily.  Dkt. No. 12 at ¶ 14.  On February 25, 2020, Plaintiff was interviewed by Defendant Lt. Meredith which was recorded by video. *Id.* at ¶ 15.  According to the FAC, Defendant Meredith "had implicit bias towards [Plaintiff] and [Plaintiff] felt intimidated and threatened. *Id.*

Defendants submit a copy of the video file of Defendant Meredith's interview of Plaintiff conducted on February 25, 2020.  Meredith Decl. ¶ 8. Ex. D; Dkt. No. 32-4.  Plaintiff was asked to describe the incident in his own words and to be as specific as possible. *Id.*  Plaintiff stated that while he was on the yard on January 23, 2020, he saw a number of inmates arguing about "fourteen to sixteen feet to the left, next to me."  Meredith Decl. ¶ 8, Ex. D; Dkt. No. 32-3.  Plaintiff further stated that the "free staff whistled like around maybe six-to-ten times." *Id.*  Plaintiff then "started walking away

from the fight," and moved to his right, next to two tables. *Id.* When Plaintiff turned around, he "saw… the shot coming," which dropped him "to the floor." *Id.* Plaintiff then "got up" and was directed by an officer to go to the fence as he was not involved in the fighting. *Id.* Plaintiff stated that there was no alarm prior to the shots, only whistling. *Id.* Plaintiff was eventually examined by medical staff who provided him with pain medication, as the round had struck him in the chest and left a bruise. *Id.* When asked to identify staff who were present, Plaintiff stated that no officers were present when the fight broke out. *Id.* He stated that Defendant Garcia was the only one shooting, and he shot four rounds. *Id.* Plaintiff stated that there was no alarm before the shooting, that he looked up and saw the bullet coming and tried to avoid it, but "he shot me." *Id.* He again stated that there was no electronic alarm, only whistling (seven times). *Id.* Plaintiff returned to his housing unit after being seen by medical staff. *Id.*

In his deposition with Defendants' counsel, Plaintiff stated that after the interview and off camera, Defendant Meredith told Plaintiff to drop the complaint, "drop it, or you never know what can happen." Pl. Dep. at 31:23-25, Dkt. No. 32-1 at 6.

The grievance against Defendant Garcia was denied in April 2020. Dkt. No. 12 at ¶ 19.

**C.    Inmate Advisory Council**

The Inmate Advisory Council ("IAC") at SVSP has formal positions that are allocated just like any other assignment with the institution. Meredith Decl. ¶ 4. A review of Plaintiff's assignment history shows that he has never been assigned to a formal position within the IAC. *Id.*, Ex. A. However, the IAC also has other positions that are informal, such as a Hispanic representative or Transgender representative. *Id.* at ¶ 5. These informal positions do not appear on an inmate's assignment history. *Id.*

Plaintiff was a Mexican IAC representative, an informal position within the IAC. *Id.* at ¶ 6. On February 27, 2020, Plaintiff was removed from that position because he had been "found guilty of numerous RVR-115's." *Id.* Defendant Meredith along with two

7

United States District Court
Northern District of California

inmates (members of the IAC) signed the memorandum regarding Plaintiff's removal. Meredith Decl. at ¶ 6, Ex. B.  According to Plaintiff, Meredith placed this "false" file in Plaintiff's "SOMS record."  Dkt. No. 12 at ¶ 16.  Plaintiff asserts that Defendant Meredith is in a conspiracy with Defendant Garcia, and therefore knowingly made this false accusation and acted intending to retaliate and intimidate Plaintiff.  *Id.*

In March 2020, Plaintiff filed an inmate grievance alleging staff misconduct by Defendant Meredith for removing him from the IAC.  *Id.* at ¶ 17.  This loss meant Plaintiff could not leave his cell for extra-curricular activities and inhibited his ability to "recreate and socialize with other inmates who had voted for [him] to receive this extra privilege." *Id.*  In the weeks that followed, it was determined that an error had occurred during the review of Plaintiff's disciplinary history that resulted in his removal from the IAC. Meredith Decl. ¶ 7.  Accordingly, during the review of Plaintiff's administrative grievance concerning the removal from the IAC, Chief Deputy Warden Parin concluded that there was insufficient evidence to support that decision because Plaintiff had no serious disciplinary infractions since arriving at SVSP.  *Id.*, Ex. C; Dkt. No. 12 at ¶ 21.  Plaintiff was reinstated to the IAC.  *Id.*  The decision did not address Plaintiff's allegation regarding the "fraudulent record" in his SOMS file.  Dkt. No. 12 at ¶ 21.  Warden Parin simply noted that when he was interviewed regarding Plaintiff's grievance on the matter, Defendant Meredith reported that "an error was conducted" when reviewing Plaintiff's disciplinary history that resulted in his removal form the IAC.  Dkt. No. 32-3 at 10.  Defendant Meredith does not explain how this error occurred nor does he deny the allegation that he placed a "false" file in Plaintiff's "SOMS record" that resulted in his removal from the IAC.  *See generally* Dkt. No. 32-4.

In the FAC, Plaintiff also alleged that Defendants violated state law in that Defendant Garcia treated him inhumanely, used excessive force, intentionally inflicted emotional distress, committed battery against him, violated the Tom Banes Civil Rights Act, and that along with Defendant Meredith, acted negligently in the performance of their

duties.  *Id.* at ¶ 26.

The Court found the amended complaint stated the following cognizable claims: (1) excessive force against Defendant Garcia; (2) retaliation claim against Defendant Meredith; and (3) related state law claims.  Dkt. No. 20 at 7.

## II.    <u>Summary Judgment</u>

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted.  *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

United States District Court
Northern District of California

file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citations omitted).  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corporation Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252).  "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 252).  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.  "[S]elf-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory." *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001); *see also Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (in equal protection case, conclusory statement of bias not sufficient to carry nomoving party's burden).

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence presented and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631.  The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.*

"When opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

10

version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-83 (2007) (police officer entitled to summary judgment based on qualified immunity in light of video evidence capturing plaintiff's reckless driving in attempting to evade capture which utterly discredits plaintiff's claim that there was little or no actual threat to innocent bystanders); *see Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (in ERISA case where the issue was whether plaintiff had actual knowledge of an alleged fiduciary breach, the court indicated that plaintiff's denial of knowledge could be discredited at summary judgment stage if it was blatantly contradicted by electronic records showing plaintiff viewed a website containing relevant disclosures of investment decisions).

### A.   <u>Excessive Force</u>

Plaintiff claims Defendant Garcia "maliciously and sadistically shot indiscriminately" at him with a 40 mm block gun without any warning, resulting in a deep bone bruise to his sternum. *See supra* at 3. Plaintiff claims the circumstances did not justify the use of such force. *Id.*

Defendants assert that Plaintiff was inadvertently hit in the chest with a foam round while six other inmates were fighting less than 20 feet from Plaintiff on the yard at SVSP. Dkt. No. 32 at 15. Defendants contend that Defendant Garcia's use of force was necessary after weighing the factors under *Hudson v. McMillian*, 503 U.S. (1992), and that he did not shoot at Plaintiff maliciously and sadistically for the purpose of harming him. *Id.* Furthermore, Defendants asserts this case is similar to *Jeffers v. Gomez*, 267 F.3d 895, 902-03 (9th Cir. 2001), in which the plaintiff was shot by an errant bullet while correctional officers were attempting to subdue a prison riot; plaintiff was shot mistakenly when one of the defendants fired at the inmate who was attempting to stab plaintiff with a makeshift weapon. *Id.* at 902. The Ninth Circuit concluded that the officers had taken the shots in a good faith effort to restore order because it was undisputed that there was a disturbance in the prison and there was no evidence suggesting the officers had any evil

motive.  *Id.* at 912.  Plaintiff has filed no opposition in response.

A prisoner has the right to be free from cruel and unusual punishment, including physical abuse by guards.  Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the core judicial determination is whether force was applied in a good-faith effort to maintain or restore discipline, or was applied maliciously and sadistically to cause harm.  *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 317 (1986)).  In making this determination, a court may evaluate the need for application of force; the relationship between that need and the amount of force used; the extent of any injury inflicted; the threat reasonably perceived by the responsible officials; and any efforts made to temper the severity of a forceful response.  *See Hudson*, 503 U.S. at 7; *see also Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation).

Furthermore, the Eighth Amendment does not require a specific intent to punish a specific individual.  *Robins v. Meecham*, 60 F.3d 1436, 1439 (9th Cir. 1995).  Rather, the correctly-stated standard for determining whether excessive force has been used in violation of the Eighth Amendment "is whether the defendants applied force 'maliciously and sadistically for the very purpose of causing harm,' – that is <u>any</u> harm."  *Id.* at 1441 (emphasis in original).  This means, for example, that prison officials violate the Eighth Amendment when they exert excessive force against one inmate which results in injury to another inmate as well.  *Id.* at 1439-41.

Defendants submit the declaration of Defendant Garcia and his incident report of the incident that occurred on January 23, 2020, along with Plaintiff's grievance interview with Defendant Meredith and excerpts from his deposition.  Viewing this evidence in the light most favorable to Plaintiff, the Court finds there remains a genuine dispute of material fact in Plaintiff's claim of excessive force against Defendant Garcia.  Although the *Hudson* factors indicate that the force used against the *fighting* inmates was reasonable, there remains a genuine dispute over whether Defendant Garcia used these circumstances

United States District Court
Northern District of California

1   to cause harm maliciously and sadistically on Plaintiff as a bystander.

2       With respect to the first *Hudson* factor, *i.e.*, need for the application of force, it is

3   undisputed that a fight broke out among several inmates. *See supra* at 3.  It is also

4   undisputed that attempts were made to stop the fight.  There is a dispute over whether

5   verbal warnings were given as well as whistles, but this dispute is not material because it is

6   undisputed that despite the warnings, the inmates continued to fight. *Id.* at 4, 5.  Plaintiff

7   asserts that the fact that none of the inmates ultimately received a serious rule violation

8   indicates that the force used was unnecessary.  However, this assertion is merely Plaintiff's

9   own lay opinion without any foundation.  Accordingly, the need for the application of

10  force to prevent injuries to inmates and restore order on the yard indicates that Defendant

11  Garcia applied force in a good faith effort to restore discipline with respect to the fighting

12  inmates.  However, it is undisputed that Plaintiff was not fighting but merely a bystander.

13  Accordingly, if Defendant Garcia intentionally shot at Plaintiff, then the application of

14  force against Plaintiff as a bystander was unreasonable.

15      Secondly, there was a direct relationship between the need for the force and the

16  amount of force used with respect to the fighting inmates.  Plaintiff alleges that Defendant

17  was firing "in a wild and unarticulated fashion."  However, he does not dispute that

18  Defendant Garcia fired a total of four shots. *See supra* at 7.  Furthermore, Defendant

19  Garcia's declaration and incident report show that his shooting was methodical and

20  deliberate.  When he first observed the six inmates striking each other, Defendant Garcia

21  states that he gave them verbal orders to get down, but they did not comply. *See supra* at

22  3.  Before firing each of his subsequent shots at different targets, Defendant Garcia states

23  that he repeated verbal orders to either get down or stop fighting and prone out. *Id*.  Under

24  these circumstances, the relationship between the need and the amount of force used

25  indicates that Defendant Garcia's application of force was applied in a good faith effort to

26  restore discipline with respect to the fighting inmates.  However, with respect to Plaintiff,

27  there was no relationship between the need and amount of force used because there was no

28

need for any force against him as a bystander as discussed in the preceding paragraph, and therefore no amount of force was reasonable against Plaintiff.

With regard to the third factor, *i.e.*, extent of any injury inflicted, it is undisputed that Plaintiff was injured by the use of force as he was struck in the sternum by one of the rounds which resulted in a bruise. However, there is a dispute over how this injury was inflicted. According to Defendants, Defendant Garcia was aiming for one of the fighting inmates with his second shot but missed; the round skipped on the ground and then struck Plaintiff. *See supra* at 4. In contrast, Plaintiff asserts that Defendant Garcia was aiming at him. *Id.* at 5-6. This dispute shall be discussed more below. Meanwhile, this factor clearly weighs in favor of Plaintiff.

The fourth *Hudson* factor, the threat reasonably perceived by the Defendant, weighs in favor of Defendant Garcia applying force in a good faith effort to restore discipline against the fighting inmates. Plaintiff asserts in the FAC that no one in close proximity was in any imminent danger of serious injury to warrant the use of the block gun. However, the undisputed evidence shows that six inmates were involved in an altercation. Furthermore, despite repeated orders to desist and the firing of several shots, the inmates continued to fight. *See supra* at 2-3. They only stopped after Defendant Garcia fired a fourth round, and by then several staff had arrived to place the inmates in handcuffs. Accordingly, the Court finds that Defendant Garcia reasonably perceived that the situation was dangerous and that a threat of harm remained as the inmates continued to fight and ignore orders, and that he stopped once the threat had abated. However, it cannot be said that Defendant Garcia had any reason to perceive a threat from Plaintiff as a bystander. Accordingly, this factor would weigh against Defendant's use of force being reasonable as to Plaintiff.

The fifth *Hudson* factor regarding efforts made to temper the severity of the forceful response also weighs in favor of Defendant Garcia applying force in a good faith effort to restore discipline with regard to the fighting inmates. Defendant Garcia states that he first

14

gave verbal commands before resorting to the 40mm launcher.  Then he shot one round at a time, as he continued to assess the situation and repeat his orders for the inmates to stop fighting before each shot.  Lastly, he used the launcher on different inmates, rather than repeatedly targeting one of them, and stopped shooting once he saw that the inmates had stopped fighting.  However, with regard to Plaintiff, the evidence viewed in his favor indicates that Defendant made no effort to temper the force applied on Plaintiff who was not fighting and heard no verbal warnings.  Accordingly, this factor weighs in favor of Plaintiff.

Furthermore, Plaintiff's allegations regarding Defendant Garcia's comments after the incident to another inmate that he had been "waiting to get plaintiff" who "got what he had coming," and to Plaintiff that he "got what [he] had coming" raise a question concerning Defendant's motivation to harm Plaintiff.  *See supra* at 6.  Defendant Garcia's declaration is silent regarding these statements, with no denial that he made such threatening statements.  Dkt. No. 32-6.  As such, this case can be distinguished from *Jeffers*, 267 F.3d 895, in which there was *no* evidence suggesting the officers had any evil motive.  Furthermore, the only eye-witness evidence submitted by Defendants is that of Defendant Garcia, who provides no corroborating evidence other than his own report of the incident.  Dkt. No. 32-6 at 5.  The Court also notes the absence of any other witness statements, staff reports, or even a video of the incident to corroborate Defendant Garcia's account.  Without any such corroborating evidence, this claim relies solely on the credibility of Plaintiff against that of Defendant Garcia.

Defendants attempt to bolster Defendant Garcia's version by asserting that Plaintiff's account is inconsistent and therefore not credible.  However, the Court must not make credibility determinations or weigh conflicting evidence with respect to a material fact.  *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  Nor does the Court find that Plaintiff's own statements are fatally in conflict.  Rather, the Court must view the evidence and the inferences to be drawn therefrom in the light most favorable to Plaintiff.  *Id.* at 631.

United States District Court
Northern District of California

Reviewing his statements from the FAC, grievance interview, and deposition, the Court finds that it cannot be said that no reasonable jury would believe Plaintiff.  While Plaintiff does not dispute that inmates were fighting and that Defendant Garcia was shooting at them, he repeatedly asserts that Defendant Garcia was also using that opportunity to shoot and harm him.  *See supra* at 5-6.  Considering the comments Defendant Garcia allegedly made in connection with this incident indicating his ill will towards Plaintiff, the inference could be drawn that Defendant Garcia used this incident as an opportunity to harm Plaintiff as a bystander.

Based on the evidence submitted, the *Hudson* factors indicate that Defendant Garcia applied force in a good-faith effort to maintain or restore discipline against the *fighting* inmates but not against Plaintiff.  Accordingly, there are disputed issues of material fact with respect to the excessive force claim against Defendant Garcia.  *See Celotex Corp.*, 477 U.S. at 323.  Accordingly, Defendants' motion for summary judgment on this claim must be denied.

### B.    Retaliation

Plaintiff claims Defendant Meredith acted to have him removed from the IAC in retaliation for Plaintiff filing a grievance against Defendant Garcia.  *See supra* at 5.

Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

The second element, causation, requires showing that the prison official intended to take the adverse action out of "retaliatory animus" to "silence and to punish" the inmate, as opposed to for some other reason. *Shepard v. Quillen*, 840 F.3d 686, 689-91 (9th Cir. 2016) (finding genuine issue of material fact as to whether defendant sent inmate to ad seg

with intent to (1) follow 15 Cal. Code Regs. § 3335(a) or (2) retaliate for inmate's complaint about staff misconduct).  Evidence probative of retaliatory animus includes proximity in time between the protected speech and the alleged adverse action, prison official's expressed opposition to the speech, and prison official's proffered reason for the adverse action was false or pretextual.  *See id.* at 690; *see also Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (non-prisoner case).  Retaliatory motive may also be shown by inconsistency with previous actions, as well as direct evidence.  *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003).  Mere speculation that defendants acted out of retaliation is not sufficient.  *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citing cases) (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit).

Defendants assert that although Plaintiff's complaint alleged that Defendant Meredith took retaliatory actions against him for filing a staff complaint against Defendant Garcia, Plaintiff's deposition reveals otherwise.  Plaintiff's deposition revealed that his retaliation claim is based on the particular sequence of events following the January 20, 2023 incident.  Dkt. No. 32 at 22.  Specifically, Plaintiff confirmed that his retaliation claim merely contends that Defendant Meredith's placement of allegedly false information in his prison file after he submitted a grievance against Defendant Garcia following the January 2020 incident constituted retaliation on the part of Defendant Meredith.  Quinn Decl., Ex. A (Pl.'s Dep. 30:17-31:10).  Defendants assert that retaliation is not established by showing adverse activity by defendants after protected speech, but that rather, Plaintiff must show a nexus between the two.  Dkt. No. 32 at 22, citing *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore, because of this")).  Defendants assert that there this no nexus between Plaintiff's filing of a grievance against Defendant Garcia and his removal from the IAC.  *Id.*  Furthermore, in the weeks following, it was determined that an error had occurred during the review of his disciplinary history that

resulted in that decision.  Meredith Decl. ¶ 7.  Defendants assert that in short, there is no evidence that Defendant Meredith retaliated against Plaintiff for his protected conduct.  Dkt. No. 32 at 22.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there remains a genuine dispute as to material facts relating to Plaintiff's retaliation claim against Defendant Meredith.  Plaintiff satisfies the first element based on the allegation that he was removed from the IAC based on a "false" file, which constitutes an adverse action.  It is undisputed that Defendant Meredith signed the memorandum regarding Plaintiff's removal based on him being "found guilty of numerous RVR-115's." *See supra* at 6.  The second and third elements require that Plaintiff show that his removal was because of protected conduct, i.e., his filing an inmate grievance against Defendant Garcia.  Defendants assert that Plaintiff's deposition indicates a lack of nexus between these two elements.  The evidence probative of retaliatory animus includes proximity of time.  Here, Plaintiff filed an inmate grievance against Defendant Garcia on February 21, 2020. *See supra* at 5.  Defendant Meredith conducted the interview for this grievance four days later, on February 25, 2020. *Id.*  Plaintiff was removed from the IAC two days later, on February 27, 2020.  Accordingly, the proximity of time is close as the sequence of events took place in less than a week's time.  Although Defendants assert that the mere fact that one incident followed another is not sufficient to establish a nexus, the evidence must be viewed in the light most favorable to Plaintiff as well as the inferences drawn therefrom. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31.  Here, the inference from this close sequence of events is that Defendant Meredith removed Plaintiff from the IAC because he filed a grievance against Defendant Garcia.  Furthermore, Defendant Meredith fails to provide any explanation regarding the so called "error" that resulted in Plaintiff's removal from the IAC nor does he deny Plaintiff's allegation that he filed "false" information into Plaintiff's SOMS file.  Moreover, Plaintiff states in his deposition that Defendant Meredith told him to "drop that complaint form, put the camera off, drop it, or you never know what

can happen." Pl.'s Dep. 31:23-25 (Dkt. No. 32-1 at 6). This alleged statement is evidence that Plaintiff's claim is more than mere speculation. Moreover, the evidence viewed in favor of Plaintiff indicates that the proffered reason for the adverse action, i.e., that Plaintiff's removal from the IAC was due to an "error," may be false or pretextual. *See Shepard*, 840 F.3d at 690.

Based on the evidence presented, there are disputed issues of material fact with respect to Plaintiff's retaliation claim. *Celotex Corp.*, 477 U.S. 323. Accordingly, Defendants' motion for summary judgment on this claim must be denied.

### C.   <u>Qualified Immunity</u>

Defendants assert in the alternative that they are entitled to qualified immunity on the excessive force and retaliation claims which bars liability. Dkt. No. 32 at 26-27.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law;'" defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

A right is clearly established if it were "sufficiently clear [at the time of the conduct at issue] that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). "The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477

(9th Cir. 2019).  If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  *Saucier*, 533 U.S. at 202.

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *See Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by *Saucier*, 533 U.S. at 194); *Henry A.*, 678 F.3d at 1000 (qualified immunity analysis requiring (1) determining the contours of the clearly established right at the time of the challenged conduct and (2) examining whether a reasonable official would have understood that the challenged conduct violated such right).  The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case.  *See Pearson*, 555 U.S. at 236 (noting that while the *Saucier* sequence is often appropriate and beneficial, it is no longer mandatory).  "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the non-movant.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).  For example, regarding the first prong, the threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  *Saucier*, 533 U.S. at 201.

### 1.    <u>Excessive Force Claim</u>

Defendants first assert that it would not have been evident to a reasonable prison official that a court could somehow find that Defendant Garcia violated the Eighth amendment when he acted to quell a fight involving several inmates and unintentionally shot an inmate who was not involved in the fight.  Dkt. No. 32 at 28.  Defendants do not

United States District Court
Northern District of California

dispute that prisoners have certain rights under the First and Eighth Amendments. *Id.* Rather, they assert that Plaintiff has failed to show how those constitutional rights were violated by Defendants in this action. *Id.*

Defendants' qualified immunity argument must be rejected because they do not present the facts in the light most favorable to Plaintiff as the nonmoving party. *See Tolan*, 134 S. Ct. at 1866. Defendants argue that it "would not have been evident that *unintentionally* shooting an inmate who was not involved in the fight amounted to malicious or sadistic conduct." Dkt. No. 32 at 28 (emphasis added). Indeed, they argue throughout their motion that Plaintiff was *inadvertently* harmed while Defendant Garcia was quelling a fight among other inmates. However, Plaintiff alleges that Defendant Garcia essentially took advantage of the situation to *intentionally* harm him maliciously and sadistically. *See supra* at 15-16. Furthermore, although Defendants again rely on *Jeffers* to assert that Defendant Garcia acted reasonably, they ignore the evidence of evil motive which exists in this case but was absent from *Jeffers*. Dkt. No. 32 at 28. Nowhere in the motion or supporting papers do Defendants deny that Defendant Garcia had any evil motive. Therefore, to correctly assert qualified immunity, Defendants would have to argue that a reasonable officer in Defendant Garcia's position would have understood that it was lawful to *intentionally* shoot at Plaintiff as a bystander under the circumstances at bar. They do not. It simply cannot be said, based on the allegations against him, that Defendant Garcia had a "reasonable, but mistaken belief" that he could intentionally shoot and harm Plaintiff as a bystander while quelling a fight involving other inmates. Qualified immunity is simply not available to someone who knowingly violates the law. *Saucier*, 533 U.S. at 202. Accordingly, Defendants have not established that they are entitled to qualified immunity on the excessive force claim.

## 2. **Retaliation Claim**

Defendants assert that Defendant Meredith is also entitled to qualified immunity because "it would not have been evident to a reasonable prison official that a court could

somehow find that Defendant Meredith violated Plaintiff's First Amendment rights when he mistakenly determined that Plaintiff was not eligible to serve on the IAC."  Dkt. No. 32 at 29.  This argument must also be rejected for the same reason as above, *i.e.*, because Defendants do not present the facts in the light most favorable to Plaintiff.  Defendants argue that Defendant Meredith "mistakenly" acted and there is no evidence that Defendant Meredith "intended to retaliate" against Plaintiff.  *Id.*  However, viewing the evidence in the light most favorable to Plaintiff, Defendant Meredith is alleged to have retaliated against Plaintiff for filing a grievance against Defendant Garcia, and the inferences drawn from the facts support this conclusion.  *See supra* at 18.  As such, it simply cannot be said that Defendant Meredith had a "reasonable, but mistaken belief" that he could remove Plaintiff from the IAC for exercising his First Amendment rights.  *Saucier*, 533 U.S. at 202.  Accordingly, Defendants have not established that they are entitled to qualified immunity on the retaliation claim.

### D.   State Law Claims

Defendants also assert that they are entitled to summary judgment in connection with Plaintiff's state law claims based on negligence, intentional infliction of emotional distress ("IIED"), battery, and violation of the Bane Act.  Dkt. No. 32 at 23.

#### 1.   Negligence

Under California law, the elements of negligence are: (1) a duty to use due care; (2) breath of that duty; (3) which proximately causes; (4) injury.  *Lopez v. City of Los Angeles*, 196 Cal.App.4th 675, 685 (2011).  The first element regarding duty of care is a legal question to be decided by the court.  *Phillips v. TLC Plumbing*, 172 Cal.App.4th 1133, 1139 (2009).  "As long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence."  *Hayes v. Cnty. of San Diego*, 57 Cal.4th 622, 632

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (2013).  "Law enforcement personnel have a degree of discretion as to how they choose to

2  address a particular situation."  *Id.*

3        Defendants assert that it is undisputed that a fight on SVSP's yard occurred on

4  January 23, 2020, that multiple inmates were ignoring orders to assume a prone position,

5  and that they were fighting each other.  Dkt. No. 32 at 24.  Defendants assert that in light

6  of this chaotic and dangerous situation, Defendant Garcia acted reasonably under the

7  circumstances to restore order and to keep other staff and inmate safe.  *Id.*, citing *Arrendell*

8  *v. Perez*, No. D065719, 2015 WL 5461502, at \*4-6, (Cal. Ct. App. 4th Dist. Sept. 17,

9  2015) (finding correctional officer not negligent for using lethal force, but missing her

10  target and shooting an innocent bystander inmate in the left eye, because she was

11  reasonably trying to sop other inmates from fighting).[5]

12        The Court has found that the evidence presented shows a genuine dispute as to

13  whether Defendant Garcia intentionally shot Plaintiff and therefore used excessive force

14  against him.  *See supra* at 15-16.  If Defendant Garcia intentionally shot at Plaintiff as a

15  bystander such that his actions were not reasonable, then it cannot be said that Defendant

16  Garcia's conduct fell within the "range of conduct that is reasonable under the

17  circumstances."  *Hayes*, 57 Cal.4th at 632.  Accordingly, Defendants are not entitled to

18  summary judgment on this claim.

19        **2.**     **Intentional Infliction of Emotional Distress**

20        IIED is comprised of three elements: (1) extreme and outrageous conduct by the

21  defendant with the intention of causing, or reckless disregard of the probability of causing,

22  emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3)

23  the plaintiff's injuries were actually and proximately caused by the defendant's outrageous

24  conduct.  *Cochran v. Cochran*, 65 Cal.App.4th 488, 494 (1998).  "California courts have

25

26  [5] Federal courts 'may consider unpublished state decisions."  Dkt. No. 320 at 24, fn. 2,
citing *Emp'rs Ins. Of Wasau v. Granite St. Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir.

27  2003).

28

set a high bar for emotional distress claims, requiring 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Lust v. State Farm Mut. Auto, Ins.*, No. 2:11-cv-02051-MCE-KJN, 2012 WL 592060, *3 (E.D. Cal. Feb. 22, 2012) (quoting *Kelley v. Conco Cos.*, 196 Cal.App.4th 191 (2011)).

Defendants assert that courts have rejected conclusory emotional distress allegations that lacked specific facts to show their nature and extent.  Dkt. No. 32 at 24-25, citing *Nelson v. County of Sacramento*, 926 F. Supp. 2d 1159, 1172 (E.D. Cal. 2013) (finding plaintiff's conclusory allegations of "pain, grief, shame, humiliation, embarrassment, anger, disappointment, depression, sleeplessness, anxiety, disappointment, damage to reputation, and worry" were insufficient to demonstrate why his alleged emotional distress rose to the level that "no reasonable [person]… should be expected to endure it").  *See also Hamilton v. Prudential Fin.,* No. 2:07-cv-00944-MCE-DAD, 2007 WL 28287792, *4 (E.D. Cal. Sept. 27, 2007) (concluding that general allegations of depression, frustration, nervousness, and anxiety were insufficient to show severe emotional distress).  Defendants assert that similarly, Plaintiff's FAC fails to set forth specific facts regarding the emotional distress that he allegedly experienced following the January 23, 2020 incident.  Dkt. No. 32 at 25.

The evidence presented does not show a genuine dispute as to any material fact relating to Plaintiff's IIED claim.  Plaintiff claims that he suffered "physical injury, fear, emotional distress, mental distress, and other injuries" due to Defendants' actions.  Dkt. No. 12 at 9.  However, Plaintiff provides no specific facts to explain the nature and extent of his emotional distress to indicate that it was of such "substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Lust*, 2012 WL 592060, *3.  Furthermore, during his video interview with Defendant Meredith, Plaintiff did not appear to be under any emotional distress nor did he mention any injuries other than the physical discomfort caused by the bruise to his sternum.

Based on the evidence presented, Defendants have shown that there is no genuine issue of material fact with respect to Plaintiff's IIED claim.  Having filed no opposition, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *Celotex Corp.*, 477 U.S. at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279.  Nor do the allegations in the FAC withstand Defendants' argument.  Accordingly, Defendants are entitled to judgment as a matter of law on this IIED claim.  *Celotex Corp.*, 477 U.S. at 323.

### 3.   <u>Battery</u>

The elements of civil battery are as follows: (1) defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to plaintiff.  *Brown v. Ransweiler*, 171 Cal.App.4th 516, 526-27 (2009).  A state law battery claim is a counterpart to a federal claim of excessive use of force.  *Id.* at 527.  In both, a plaintiff must prove that the peace officer's use of force was unreasonable.  *Id.*, citing *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1102.  Defendants assert that because Defendant Garcia's use of force was reasonable under the circumstances, they are entitled to summary judgment on this claim.  Dkt. No. 32 at 26.

The Court has found that the evidence presented shows a genuine dispute as to whether Defendant Garcia intentionally shot Plaintiff and therefore used excessive force against him.  *See supra* at 15-16.  Accordingly, it cannot be said that Defendant Garcia may not be held liable for battery for any injury that resulted from the use of such intentional and excessive use of force.  *See Brown*, 171 Cal.App.4th at 533.  Defendants are not entitled to summary judgment on this claim.

### 4.   <u>Bane Act Claim</u>

The Tom Bane Civil Rights Act authorizes an action for injunctive and other equitable relief where a person, whether or not acting under color of law, interferes or attempts to interfere, "by threat, intimidation, or coercion," with the exercise or enjoyment

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of any individual or individuals of rights secured by state or federal law.  *Allen v. City of Sacramento*, 234 Cal.App.4th 41, 66 (2015).  Defendants assert that they did not interfere with Plaintiff's rights and therefore did not violate the Bane Act.  Dkt. No. 32 at 26.

The Court has found that the evidence presented shows a genuine dispute as to whether Defendant Garcia intentionally shot Plaintiff and therefore used excessive force against him and whether Defendant Meredith retaliated against Plaintiff for filing a grievance.  *See supra* at 15-16, 18.  Accordingly, it cannot be said that Defendants have established that there is no genuine issue of material fact with respect to Plaintiff's Bane Act claim based on their interference with the exercise or enjoyment of his rights under the Eighth and First Amendments.  Defendants are not entitled to summary judgment on this claim.

**III**.   <u>**Referring Case to Settlement Proceedings**</u>

The Court has established a Pro Se Prisoner Settlement Program under which certain prisoner civil rights cases may be referred to a neutral Magistrate Judge for settlement.  In light of the existence of triable issues of fact as to whether Defendants Garcia and Meredith violated Plaintiff's rights under the Eighth and First Amendments, the Court finds the instant matter suitable for settlement proceedings.  Accordingly, the instant action will be referred to a neutral Magistrate Judge for mediation under the Pro Se Prisoner Settlement Program.

**CONCLUSION**

For the reasons stated above, the Court orders as follows:

1.       Defendants' motion for summary judgment is **DENIED in part and GRANTED in part**.  Dkt. No. 32.  Defendants' motion regarding Plaintiff's excessive force and retaliation claims as well as his state claims for negligence, battery, and Banes Act violation against Defendants Garcia and Meredith is denied.  The motion with respect to Plaintiff's state claim for IIED is granted.  The IIED claim is **DISMISSED with**

United States District Court
Northern District of California

1   **prejudice**.

2       2.      The instant case is **REFERRED** to Judge Robert M. Illman pursuant to the

3   Pro Se Prisoner Settlement Program for settlement proceedings on the claim in this action

4   against Defendants as described above.  The proceedings shall take place **within ninety**

5   **(90) days** of the filing date of this order.  Judge Illman shall coordinate a time and date for

6   a settlement conference with all interested parties or their representatives and, within ten

7   (10) days after the conclusion of the settlement proceedings, file with the court a report

8   regarding the prisoner settlement proceedings.

9       3.      Other than the settlement proceedings ordered herein, and any matters

10  Magistrate Judge Illman deems necessary to conduct such proceedings, this action is

11  hereby **STAYED** until further order by the court following the resolution of the settlement

12  proceedings.

13      4.      The Clerk shall send a copy of this order to Magistrate Judge Illman in

14  Eureka, California.

15      This order terminates Docket No. 32.

16      **IT IS SO ORDERED.**

17  Dated:  __July 3, 2024_____                    _____

18                                                        BETH LABSON FREEMAN
                                                          United States District Judge

19

20

21

22

23

24

25  Order Denying MSJ; Refer Illman
    PRO-SE\BLF\CR.20\08285Amezquita_deny-msj&refer.Illman

26

27

28                                        27